**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON**

**CIVIL ACTION NO. 04-174-DLB**

**PATRICIA ELLIOTT**                                                                              **PLAINTIFF**

**VS.**                              **MEMORANDUM OPINION & ORDER**

**METROPOLITAN LIFE INSURANCE CO.**                                        **DEFENDANT**

**********************************

Plaintiff, a former employee of Great American Financial Resources ("Great American") and participant in its employee benefit plan ("Plan"), brought this ERISA action against the Plan's administrator for wrongful denial of long-term disability (LTD) benefits. *See* 29 U.S.C. § 1132(a)(1)(B).

This case is presently before the Court upon Defendant's motion for judgment affirming its decision (Doc. #17), and Plaintiff's motion seeking reversal. (Doc. #18).[1] Both parties having filed their respective responses (Docs. #19-20) and replies (Docs. #22-23), the matter is now ripe for review.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Patricia Elliott was hired by Great American Financial Resources ("Great American") on July 6, 1993. During her tenure with Great American, Plaintiff worked as a

---

[1]Although Plaintiff's original motion was styled a "Motion for Summary Judgment," she subsequently amended it to seek reversal of Defendant's decision to deny her long-term disability benefits. (Doc. #23). *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998) (holding that summary judgment procedures may no longer be used in the Sixth Circuit in ERISA actions to recover benefits).

business quality analyst. As a full-time employee, Plaintiff was a participant in a long-term disability (LTD) benefit plan sponsored by Great American's parent company, American Financial Group, Inc., and administered by Defendant Metropolitan Life Insurance Company ("MetLife"). The Plan provided the following definition of disability:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
> 2. after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(AR 26).

### A.   Medical evidence

In September 2002, Plaintiff began experiencing increasing neck pain and weakness in her extremities. (AR 100-101). Plaintiff has a history of neck and spinal cord trauma, which dates back to August 1989 when she was involved in an automobile accident. (*Id*.). Plaintiff was ejected from the car, and suffered serious neck and spinal cord injuries that required surgery and a lengthy rehabilitation process. Facing a possible setback in her recovery, Plaintiff consulted Dr. Charles Kuntz, of the University of Cincinnati-Mayfield Comprehensive Spine Clinic, on October 29, 2002. (*Id*.). Dr. Kuntz recommended an MRI of Plaintiff's cervical spine, and instructed her to avoid heavy lifting and activities that put her spine at "significant risk." (*Id*.).

Plaintiff returned to Dr. Kuntz on December 10, 2002 for a follow-up evaluation and to review the results of the MRI, which was performed on November 1. (AR 98). The MRI

2

revealed evidence of C1-C2-C3 malalignment, posterior C1-C3 fusion, and abnormal cervical spinal cord signal at C2-C3 and C7, all of which was consistent with her medical history. (*Id*.). Also revealed was multilevel segmental degenerative disease with a cervical kyphosis and mild neuroforaminal narrowing. (*Id*.). However, there was no evidence of high-grade spinal cord compression. (*Id*.). Based on these results, Dr. Kuntz recommended electrodiagnostic studies. (*Id*.).

Dr. David Chow performed an EMG and nerve conduction study on January 14, 2003. (AR 114-18). His impressions were as follows: 1) normal EMG and nerve conduction study of the bilateral upper and lower limbs, and 2) no evidence of radiculopathy, entrapment neuropathy, or peripheral neuropathy. (*Id*.).

Plaintiff followed-up with Dr. Kuntz on February 6, 2003 and underwent further testing. (AR 96-97). CT myelographic imaging of Plaintiff's cervical spine confirmed prior findings (trauma and posterior C1-3 fusion), and revealed anterolisthesis of C2 on C3, with a subaxial mild kyphotic deformity, and neural foraminal stenosis at the level of the previous injury. (AR 93-94). There was no evidence of significant central canal stenosis or severe neural foraminal stenosis from C4-5 or T1-2. (*Id*.). Plaintiff's final visit to Dr. Kuntz was on April 22, 2003. (*Id*.). Noting no significant change in her condition, Kuntz recommended a neurological consultation. (*Id.*).

Dr. Alexander Schneider performed the consult and rendered the following opinion:

Fourteen years status post cervical spinal cord injury with C2-3 fracture status post stabilization. Currently, she has no signs of motor or myelopathic symptoms or findings on exam. She does have decreased pinprick in a shawl-like distribution consistent with a central cord-like syndrome. She has signal alteration on her MRI at the C2-3 and C7 levels that would be reasonable to follow-up over time. She is better than she was six months

3

ago, but continues to have some chronic pain and anxiety related to this.  No surgical lesion was identified.

(AR 90-92).  Based on this assessment, Dr. Schneider recommended a C-collar as needed, physical therapy, and Elavil.  (*Id*.).  Plaintiff followed-up with Dr. Schneider three months later.  (AR 88-89).  On August 21, 2003, Dr. Schneider noted that:

> Since starting the Elavil, [Plaintiff] has done quite better.  She states she is moving around better and her neck pain is better.  Her numbness across her shoulders and neck has resolved.  The C collar at night seems to help.  She states she is sleeping well.  She does have low back pain and hip pain.  She denies bowel or bladder problems or spasms.  She has some weakness and numbness when she is up too long, particularly in her legs and feet.  This is an old finding.  She is continuing physical therapy[,] including water therapy.

(*Id*.).

Plaintiff underwent one final MRI on November 24, 2003.  (AR 147).  According to Dr. Schneider, the MRI revealed surgical changes, along with mild to moderate diskogenic disease and degenerative changes.  (*Id*.).  There was no clear syringomyelia, which was possibly attributable to a metallic artifact that limited the parenchymal visualization.  (*Id*.).  Noting her dependency on medication and amitriptyline to manage her chronic pain syndrome, Dr. Schneider opined that:

> [Plaintiff's] work is limited due to her chronic pain syndrome and spinal cord injury that is exacerbated by spending any length of time on her feet or sitting in a single position for any length of time.  She should not do any lifting.  She should not be crouching into small spaces or doing any repetitive motion type of work.  She should not do any work that requires reaching above her head. It is my opinion that her chronic neurologic condition causes her significant disability.  This condition is chronic and will likely worsen in the future. Furthermore, she may require further surgical intervention as she develops further arthritic changes.

(*Id.*).

### B.   Administrative evidence

4

Plaintiff submitted a claim for long-term disability (LTD) benefits on September 16, 2003.[2]  Defendant denied her claim on December 1, 2003 (AR 143-45), and Plaintiff appealed that decision on January 9, 2004.  Defendant notified Plaintiff by letter dated January 15, 2004 that it had referred her claim for an independent claim review.  (AR 152). Dr. Robert Menotti, a specialist in internal medicine and general surgery, conducted the review and concluded that, based on the findings of Drs. Schneider and Kuntz, Plaintiff is not "medically unable to perform sedentary work."  (AR 154-55).  Defendant, therefore, affirmed its initial denial by letter dated March 4, 2004.  (AR 159-60).  Having exhausted her administrative remedies, Plaintiff filed the instant suit challenging Defendant's denial of benefits on August 17, 2004.

## II.  ANALYSIS

### A.     Standard of Review

The Sixth Circuit has consistently stated that, "As a general principle of ERISA law, federal courts review a plan administrator's denial of benefits de novo, unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Wilkins v. Baptist Healthcare Sys.*, Inc., 150 F.3d 609, 613 (6th Cir. 1998) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, (1989)).  When a plan administrator has discretionary authority to determine benefits, a district court will review a decision to deny benefits under "the highly deferential arbitrary and capricious standard of review."  *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d

---

[2]Plaintiff's last day at Great American was March 25, 2003.  She began receiving short-term disability benefits, in the amount of $1387.85 every two weeks, the following day.  (AR 175).  She filed for LTD benefits when those benefits ceased.

5

376, 380 (6th Cir. 1996); *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001).

That standard is the least demanding form of judicial review of administrative action. When

applying the arbitrary and capricious standard, a court must decide whether the plan

administrator's decision was rational in light of the plan's provisions. Stated differently,

when it is possible to offer a reasoned explanation, based on the evidence, for a particular

outcome, that outcome is not arbitrary or capricious. *Williams v. International Paper Co.*,

227 F.3d 706, 712 (6th Cir. 2000).

In the instant case, the clear language of the Plan gives Defendant, as Plan

Administrator, discretion to determine eligibility for benefits and to construe the terms of the

Plan. The Plan expressly provides:

> In carrying out their respective responsibilities under the Plan, *the Plan*
> *administrator and other Plan fiduciaries shall have discretionary authority to*
> *interpret the terms of the Plan and to determine eligibility for and entitlement*
> *to Plan benefits in accordance with the terms of the Plan.* Any interpretation
> or determination made pursuant to such discretionary authority shall be given
> full force and effect, unless it can be shown that the interpretation or
> determination was arbitrary and capricious.

(AR 63-64) (emphasis added). The Court concludes, and both parties agree, that judicial

review is limited to determining whether Defendant's decision to deny Plaintiff benefits was

arbitrary and capricious. With that standard in mind, the Court turns to the merits of

Defendant's decision.

6

**B.     Discussion**

Plaintiff challenges Defendant's denial decision on several grounds.  First, she claims that Dr. Schneider's December 2003 report establishes that she cannot work and is significantly disabled.  According to Plaintiff, the restrictions imposed by Dr. Schneider (i.e., no standing, sitting, lifting, crouching, repetitive motions, and reaching) preclude her from performing even sedentary work.  Second, Plaintiff attempts to discredit the opinion of Defendant's consultative examiner, Dr. Menotti, by arguing that he: 1) found the opinions of her treating physicians credible, but nevertheless concluded that she is capable of sedentary work, 2) omitted key portions of Dr. Schneider's findings and opinions, and 3) interpreted portions of the record out of context.[3]  In support, she relies on the case of *Finazzi v. Paul Revere Life Ins. Co./UNUM Provident Corp.*, 327 F. Supp. 2d 790 (W.D. Mich. 2004).

Defendant, on the other hand, claims that its decision to deny Plaintiff's claim for LTD benefits was based upon "a deliberate, principled reasoning process supported by substantial evidence ...." (Doc. #17, p. 8).  According to Defendant, that evidence includes: 1) Dr. Chow's January 2003 findings (i.e., normal EMG and nerve conduction study, no evidence of radiculopathy, entrapment neuropathy, or peripheral neuropathy), 2) Dr. Kuntz's April 22, 2003 findings (no evidence of significant central canal stenosis, severe neural foraminal stenosis from C4-5 or T1-2, or significant neural compression to account for Plaintiff's upper and lower extremity weakness), and 3) Dr. Schneider's observation that

_____

[3]Plaintiff also faults Defendant for not ordering her to undergo an independent medical examination (IME).  The terms of the Plan make clear, however, that Defendant retained the right to have claimants examined by medical specialists of its choice, the exercise of which was in Defendant's discretion (there is nothing in the Plan that requires an IME).

Plaintiff was responding well to treatment and therapy.  Finally, Defendant relies on Dr. Menotti's opinion that Plaintiff is not precluded from performing sedentary work.

Plaintiff cites *Finazzi* for the proposition that "Plan administrators cannot deny benefits where the [claimant] has established disability through her treating physicians and the [administrator] has relied on its own doctor's opinions without those doctors examining the [claimant], without an independent medical examination being performed, without those doctors challenging or criticizing the opinions of the treating physicians, and by merely stating that the clinical findings demonstrate the [claimant] should be able to perform the duties of sedentary work." (Doc. #20, p. 7).  However, as noted by Defendant, the *Finazzi* court recognized that, generally, an administrator may rely on the opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits. *Finazzi*, 327 F. Supp. 2d at 794.  The court in that case was presented to an exception to the general rule based upon the particular facts before it, namely that the plaintiff suffered three heart attacks in a seven-year period.  *Id*. at 791.  The court also stated:

> to terminate disability benefits in the face of persistent opinions of two long-term treating physicians, one of whom is a board certified cardiologist, that plaintiff is not able to endure the stress even of sedentary work and that return to work may endanger his life, based exclusively on opinions of three board certified cardiologists, who never examined plaintiff, have not expressly challenged or criticized the opinions of the treating physicians, and who have stated merely that clinical findings demonstrate plaintiff should be able to perform the duties of sedentary or light work, without obtaining a single independent medical examination of plaintiff, is not a reasoned decision.

*Id*. at 795.  Those circumstances are not present here.

8

The job description provided by Plaintiff's employer, Great American, reveals that her former position was sedentary in nature.[4]  In particular, it lists the following essential duties of the business quality (systems) analyst position: 1) develop and prepare routine and non-routine reports needed from administration systems to effectively audit business activity, 2) coordinate with other business areas to clarify/correct data as needed to ensure accuracy of reports, 3) edit and review reports with management to ensure they meet business needs, 4) generate ideas and reporting options to effectively communicate business activity to senior management, 5) assist to identify and establish audit checkpoints in business processes, 6) work with IT/Policy Administration support to drive effectiveness of reports needed, 7) develop and maintain knowledge of policy administration processes and functions, and 8) participate on project teams.  (AR 174).

Based upon a review of the record, the Court concludes that Defendant's determination that Plaintiff was not disabled within the meaning of the Plan, and therefore not entitled to LTD benefits, was not arbitrary or capricious.  First, despite her protestations to the contrary, Dr. Schneider did not opine that she is unable to work, but rather stated that her ability to work is limited, presumably due to the physical restrictions imposed.  Second, and more importantly, Dr. Menotti concluded that Plaintiff is not incapable of performing sedentary work.  This finding is significant because the Plan itself defines "disability" as an inability to "earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings *at your Own Occupation* for any employer in your Local Economy ...."  (AR 26),

---

[4]According to Defendant, Plaintiff's position was a "sedentary desk job."  It appears that Plaintiff does not contest that characterization, but rather claims that she is precluded from performing even sedentary level work.

and Defendant has put forth evidence - in the form of a job description - that Plaintiff's position was sedentary in nature. Therefore, Dr. Menotti's opinion that Plaintiff is not precluded from performing sedentary work does, indeed, furnish a rational basis for finding that she was not disabled, given that her former occupation was classified as such and did not require her to perform any of the physical activities prohibited by Dr. Schneider.

### III. CONCLUSION

In accordance with the above,

**IT IS ORDERED** that:

(1)    Defendant's Motion for Judgment Affirming Claim Administrator's Decision to Deny Plaintiff's Claim for Benefits (Doc. #17) be, and hereby is, **GRANTED**; and

(2)    Plaintiff's Motion for Summary Judgment (Doc. #18) be, and hereby is, **DENIED**.

This 20th day of September, 2005.



Signed By:

*David L. Bunning*   *DB*

**United States District Judge**

G:\DATA\Opinions\2-04-174-AffirmDenial.wpd